```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------X

UNITED STATES OF AMERICA        :

          - v. -                :        08 Cr. 162 (RPP)

JACOB NATANOV,                  :

             Defendant.         :

----------------------------X
```

## MEMORANDUM OF LAW IN OPPOSITION TO
## THE DEFENDANT'S PRE-TRIAL MOTIONS

```
                              MICHAEL J. GARCIA
                              United States Attorney
                              Southern District of New York
                              Attorney for the United States
                                      of America
```

```
STEVE C. LEE
Assistant United States Attorney

      - Of Counsel -
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X

UNITED STATES OF AMERICA        :

        - v. -                  :        08 Cr. 162 (RPP)

JACOB NATANOV,                  :

            Defendant.          :

-----------------------------X

## **MEMORANDUM OF LAW IN OPPOSITION TO**
## **THE DEFENDANT'S PRE-TRIAL MOTIONS**

The Government respectfully submits this memorandum of law in opposition to defendant Jacob Natanov's pre-trial motions to: (1) dismiss the Indictment, (2) inspect Grand Jury minutes, and (3) suppress evidence to be offered at trial against the defendant.  As set forth below, the defendant's motion should be denied in all respects.

### **BACKGROUND**

Indictment 08 Cr. 162 (RPP), attached to the Defendant's Motion as Exhibit A, charges Jacob Natanov (the "defendant") with conspiracy to launder money, in violation of Title 18, United States Code, Section 1956(h).

As set forth in the Criminal Complaint filed in this matter, which is attached to the Defendant's Motion as Exhibit B, in or about 2007, Special Agent Elizabeth Nygaard became aware of a fraudulent scheme by which elderly victims were informed by telephone that they had won a cash prize, but were told that they must pay certain fees in order to claim the prize.  The victims

were then instructed to send money by Federal Express and other
similar carriers to particular addresses in the New York
metropolitan area.  After the money was sent, the victims were
often asked to send more money through Federal Express and other
similar carriers to particular addresses in order to claim their
prize.  Ultimately, no prize or money award was ever sent to any
of the victims. (Complaint p.2)

From interviewing victims of this fraudulent scheme and
reviewing records provided by Federal Express, Special Agent
Nygaard learned that packages of cash were being sent by victims
to "NELLIE S 108-11 Queens Blvd., Flushing, N.Y." (Complaint p.2-
3).  A Federal Express employee who was interviewed also
indicated that Federal Express Packages were being addressed to
"NELLIES" and were being sent to "108-11 Queens Blvd" in Forest
Hills, New York. (Complaint p.3).  When this Federal Express
employee attempted to deliver these packages to that address, he
was directed to deliver these packages next door to "Nellie's
Jewelry," at 108-09 Queens Boulevard," where a man signed for the
packages by using the name "Jacobs." (Complaint p.3).

On or about June 26, 2007, as a Federal Express
delivery truck was parking in the vicinity of Nellie's Fine
Jewelry ("Nellie's"), located at 108-09 Queens Boulevard, Forest
Hills, New York, Special Agent Elizabeth Nygaard of the FBI
entered Nellie's and observed the defendant working behind the

-2-

jewelry counter. (June 26, 2007 FBI 302 ("Gov. Ex. A," also
included as an unmarked Defense Exhibit)).  Immediately after
Special Agent Nygaard entered Nellie's, two Federal Express
couriers entered and one of them handed the defendant a Federal
Express package (the "Federal Express package"). (Gov. Ex. A).
The defendant told this Federal Express courier that he could
write, "Jacob, Coyne, whatever," for his records. (Gov. Ex. A).
After the defendant received the package and the Federal Express
couriers left Nellie's, Special Agent Nygaard was joined by other
Special Agents (collectively, the "Special Agents") who together
questioned the defendant about the Federal Express package that
he had just received. (Gov. Ex. A).

        The defendant was asked questions about the contents of
the Federal Express package and why he used the name "Jacob" or
"Coyne." (Gov. Ex. A).  After the defendant answered these
questions, the Special Agents asked the defendant to open the
Federal Express package. (Gov. Ex. A).  The defendant then opened
the package and found a Reader's Digest magazine wrapped in
snowman wrapping paper which was taped up on three sides with
masking tape (the "taped up magazine"). (Gov. Ex. A).  When asked
to open the taped up magazine, the defendant refused to untape
the magazine. (Gov. Ex. A).  The defendant was asked by one of
the Special Agents what he would do with this magazine.  The
defendant said he would throw it out. (Gov. Ex. A).

-3-

One of the Special Agents then asked the defendant if they could take the magazine with them.  The defendant answered that they could. (Gov. Ex. A).  The Special Agents then walked out of Nellie's without incident.  At no point during that day was the defendant arrested or told that he was going to be placed under arrest.  After the Special Agents had left Nellie's and opened the taped up magazine, they discovered that this magazine contained approximately $4,000 in cash. (Gov. Ex. A).

As set forth in the Complaint, Special Agent Nygaard interviewed multiple victims and other individuals over the course of the investigation. (Complaint p.3-5).  Ultimately, the investigation revealed that approximately 76 packages were sent by Federal Express to "Jeff Jacobs" and were delivered to "Nellie's Jewelry" at 108-11 Queens Boulevard, Forest Hills, New York, and approximately 32 packages were sent to another business operated by the defendant. (Complaint p.5).

For the purpose of the defendant's motion and the Government's opposition, the facts as set forth above are uncontested by the defendant.

**ARGUMENT**

The defendant's motions are without merit.  The defendant's arguments concerning dismissal of the indictment and for inspection of grand jury minutes clearly fail.  Additionally, the defendant's motion to suppress the contents of the Federal

-4-

Express package given by the defendant to FBI Special Agents can
be dismissed without a hearing based upon uncontested facts.

## I.   DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AND REQUEST TO REVIEW GRAND JURY MINUTES SHOULD BE DENIED.

### A.   The Relevant Facts

On February 27, 2008, a Grand Jury sitting in the
Southern District of New York returned an Indictment charging the
defendant with one count of conspiracy to commit money
laundering, in violation of Title 18, United States Code, Section
1956(h).

On May 15, 2008, the defendant, through his counsel,
filed a motion to dismiss the Indictment for "insufficient
evidence and on further grounds that the evidence herein,
insufficient as it is, resulted from property illegal seized from
defendant, in violation of his Fourth Amendment rights."   The
defendant also argues that the Indictment should be dismissed
because of "the absence of proof that the defendant knew anything
about the fraud and was the intended recipient of the moneys
seized by the Special Agent."   The defendant further argues that
"there is no evidence in this case from which an inference of
guilt on the part of [the defendant] may be drawn."   However, in
moving to dismiss the Indictment, the defendant's arguments
challenge the sufficiency of the Government's evidence, not the
sufficiency of the Indictment.   As such, the defendant's
arguments are properly raised as a motion for a judgment of

-5-

acquittal at the conclusion of the Government's case at trial, and not on a motion to dismiss the Indictment. As a result, the defendant's motion to dismiss the Indictment must fail.

### B.    The Applicable Law

Generally, in deciding a motion to dismiss, a court looks only to the face of the indictment. See, e.g., United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998). To be legally sufficient, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (citations omitted); United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (citations omitted). An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events. Hamling v. United States, 418 U.S. 87, 117 (1974); Russell v. United States, 369 U.S. 749, 763-65 (1962); Stavroulakis, 952 F.2d at 693; United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975).

The Federal Rules of Criminal Procedure encourage succinct criminal pleadings. See Fed. R. Crim. P. 7(c)(1). While precision and proper notice to the defendant cannot be sacrificed for the sake of brevity, courts view pleadings with

-6-

common sense and "[a]n indictment must be read to include facts
which are necessarily implied by the specific allegations made."
United States v. Silverman, 430 F.2d 106, 111 (2d Cir.),
modified, 439 F.2d 1198 (2d Cir. 1970).  When an indictment
delineates the elements of a charged offense, however concisely,
the underlying objectives of pleading – notice of the charge and
protection against double jeopardy – may be further promoted by
pre-trial discovery.  See United States v. McClean, 528 F.2d
1250, 1257 (2d Cir. 1976).  Furthermore, in a conspiracy case,
"[t]he Supreme Court has held that . . . a [conspiracy] count
need only 'identify the offense which the defendants conspired to
commit . . .,' and that it need not 'with technical precision,
state all the elements essential to the commission of the
[substantive] crimes . . . .'"  United States v. Messina, 481
F.2d 878, 880 (2d Cir. 1973) (quoting Williamson v. United
States, 207 U.S. 425, 447 (1908)); see also United States v.
Mitchell, 372 F. Supp. 1239, 1253 (S.D.N.Y.) ("An indictment
charging the essential elements of a conspiracy need not allege
with particularity the means by which the substantive crime
alleged to be the object of the conspiracy was to be
accomplished.") (citations omitted), appeal dismissed, 485 F.2d
1290 (2d Cir. 1973).

        It is well established that a facially valid indictment
may not be dismissed on the ground that it is based on

-7-

insufficient evidence.  <u>United States</u> v. <u>Williams</u>, 504 U.S. 36, 54 (1992); <u>United States</u> v. <u>Casamento</u>, 887 F.2d 1141, 1182 (2d Cir. 1989).  As the Supreme Court has stated, "it would run counter to the whole history of the grand jury institution to permit an indictment to be challenged on the ground that there was inadequate or incompetent evidence before the grand jury." <u>Williams</u>, 504 U.S. at 55 (internal quotation marks and citations omitted).  Thus, a challenge to the adequacy of the evidence does not provide a basis for dismissing the Indictment.  <u>United States</u> v. <u>Elson</u>, 968 F. Supp. 900, 905 (S.D.N.Y. 1997).

### C.    Discussion

The conspiracy to commit money laundering charge in Count One of the Indictment properly tracks the statutory language and includes more than sufficient information to provide the defendant with notice of the charges he must meet, and afford him protection against double jeopardy in a future prosecution. Count One also sets forth the approximate times and places of the acts alleged.  Second Circuit law makes clear that the language of the Indictment is sufficient to withstand a motion to dismiss the Indictment.  <u>See</u> <u>Stavroulakis</u>, 952 F.2d at 693.

Rather than attacking the sufficiency of the allegations in the Indictment, the defendant attempts to anticipate what the evidence at trial will be, and argues that this evidence will not be sufficient to establish the defendant's

-8-

participation in a conspiracy to launder money.  Of course, there
has been no trial in this case, and the Government has not yet
had the opportunity to present all admissible evidence and
testimony to the trier of fact.  It is precisely for this reason
that in considering a motion to dismiss charges contained in an
indictment, courts are limited to the actual language contained
in the indictment.  See Alfonso, 143 F.3d at 776; see also United
States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir. 1999)
(noting that on a motion to dismiss an indictment, the Court must
treat the allegations in the Indictment as true).

       For similar reasons, issues as to the sufficiency of
the evidence are generally not addressed on a pretrial motion to
dismiss.  See Alfonso, 143 F.3d at 777 (sufficiency of evidence
satisfying jurisdictional element of Hobbs Act "is not
appropriately decided on a motion to dismiss").  Federal Rule of
Criminal Procedure 12(b)(2) itself provides that a defendant is
only entitled to raise in pretrial motions a "defense, objection,
or request which is capable of determination without the trial of
the general issue."  The appropriate time for a defendant's
motion to dismiss charges based on insufficient evidence, such as
the motion the defendant makes, is at the close of the
Government's case-in-chief, when a defendant may make a Motion
for a Judgment of Acquittal pursuant to Federal Rule of Criminal
Procedure 29.  See Fed. R. Crim. P. 29; see also United States v.

-9-

Luguis, 166 F. Supp.2d 776, 779 (S.D.N.Y. 2001) (denying motion
to dismiss because "[t]he appropriate time for defendant's....
motion is at the close of the government's case-in-chief or of
all the evidence or after the jury's verdict"); United States v.
Villaneuva Madrid, 302 F. Supp.2d 187, 191-92 (S.D.N.Y. 2003)
(pretrial motion to dismiss denied as premature); United States
v. Labate, S1 00 Cr. 632 (WHP), 2001 WL 533714, at *6 (S.D.N.Y.
May 18, 2001) (pretrial challenge to RICO indictment based on
sufficiency of evidence denied as premature); United States v.
Fruchter, 104 F. Supp.2d 289, 298 (S.D.N.Y. 2000) (same); United
States v. Reale, No. S4 96 Cr. 1069 (DAB), 1997 WL 580778, at
*5-6 (S.D.N.Y. Sept. 17, 1997) (same); United States v. Elson,
968 F. Supp. 900, 905 (S.D.N.Y. 1997) (same); United States v.
Torres, No. S2 94 Cr. 466 (JFK), 1995 WL 261531, at *3 (S.D.N.Y.
May 4, 1995) (same).  These authorities make clear that the
relief sought by the defendant is not available because the facts
have yet to be determined at trial.

        The defendant has cited no authority for the
proposition that his motion is appropriately raised prior to
trial and his arguments conflate the requirements for sufficient
pleading with the standard of proof required at trial.  In fact,
the only authority cited by the defendant in support of his
motion to dismiss charges in the Indictment involved challenges
to the sufficiency of the evidence at trial.  If, after the

-10-

Government has presented its case, the defendant contends that the facts presented <u>at trial</u> are insufficient to prove the charges in the Indictment, the defendant may make a Rule 29 motion at that point.  Until then, the law makes clear that the defendant's attacks on the Government's proof are premature, and his motion to dismiss the Indictment should be denied. See <u>Alfonso</u>, 143 F.3d at 777; Fed. R. Crim. P. 12(b)(2).

     The defendant also has not provided any authority for inspecting the grand jury minutes.  Absent "specific factual allegations of government misconduct" in the course of grand jury proceedings, inspection of grand jury minutes is rarely permitted.  <u>United States</u> v. <u>Torres</u>, 901 F.2d 205, 233 (2d Cir. 1990).  Even if the defendant's Fourth Amendment claims had merit, review of the grand jury proceedings to determine whether any admissible evidence was presented would be improper, because grand juries need not base their indictments on admissible evidence.  <u>Williams</u>, 504 U.S. at 55; <u>Costello</u> v. <u>United States</u>, 350 U.S. 359, 363 (1956).

## II.  DEFENDANT'S MOTION TO SUPPRESS THE FEDERAL EXPRESS PACKAGE AND ITS CONTENTS SHOULD BE DENIED WITHOUT A HEARING.

### A.    The Relevant Facts

     On or about June 26, 2007, as a Federal Express delivery truck was parking in the vicinity of Nellie's Fine Jewelry ("Nellie's"), located at 108-09 Queens Boulevard, Forest Hills, New York, Special Agent Elizabeth Nygaard of the Federal

-11-

Bureau of Investigation entered Nellie's and observed the defendant working behind the jewelry counter. Immediately after Special Agent Nygaard entered Nellie's, two Federal Express couriers entered and one of them handed the defendant a Federal Express package (the "Federal Express package"). The defendant told this Federal Express courier that he could write, "Jacob, Coyne, whatever," for his records. After the defendant received the package and the Federal Express couriers left Nellie's, Special Agent Nygaard was joined by two other Special Agents who questioned the defendant about the Federal Express package that he had just received.

The defendant was asked questions about the contents of the Federal Express package and why he used the name "Jacob" or "Coyne." After the defendant answered these questions, the Special Agents asked the defendant to open the Federal Express package. The defendant then opened the package and found a Reader's Digest magazine wrapped in snowman wrapping paper which was taped up on three sides with masking tape (the "taped up magazine"). When asked to open the taped up magazine, the defendant refused to untape the magazine. The defendant was asked by one of the Special Agents what he would do with this magazine. The defendant said he would throw it out.

One of the Special Agents then asked the defendant if they could take the magazine with them. The defendant answered

-12-

that they could.  The Special Agents then walked out of Nellie's
without incident.  At no point during that day was the defendant
arrested or told that he was going to be placed under arrest.
After the Special Agents had left Nellie's and opened the taped
up magazine, they discovered that this magazine contained
approximately $4,000 in cash.  None of these facts as set forth
above are controverted by the affidavit submitted by the
defendant with his pre-trial motions, and as a result, the motion
can be resolved without a hearing.[1]

## B.    The Applicable Law

A search based on the consent of an individual may be
undertaken without a warrant or probable cause, and any evidence
discovered during the search may be seized and admitted at trial.
See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United
States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993).   The
touchstone of valid consent is voluntariness.   Bustamonte, 412
U.S. at 235, 241; United States v. Garcia, 56 F.3d 418, 422-23
(2d Cir. 1995).  The Fourth Amendment only prohibits

_____

[1]      The defendant asserts in his sworn affidavit that
"agents did not ask [him] for permission to open the second
package." However, this does not create an issue of fact that
would require a hearing.  The defendant does not contest that he
allowed the interviewing agents to take the magazine (the "second
package") with them.  By indicating that he was going to throw
out the magazine and by granting consent to the agents to take
the "second package," case law clearly indicates as set forth
below that the opening of the "second package" was therefore
lawful.

-13-

"unreasonable" searches and seizures, and it is "well
established" that an individual's voluntary consent to a search
"render[s] it reasonable." United States v. Garcia, 56 F.3d at
422 (citations omitted).  Accordingly, "[s]o long as the police
do not coerce consent, a search conducted on the basis of consent
is not an unreasonable search." Id. (citing Bustamonte, 412 U.S.
at 228).  "[K]nowledge of the right to refuse consent is not a
requirement to a finding of voluntariness, although it may be a
factor in considering whether the consent was coerced." Id. at
422-23 (citations omitted); see also United States v. Yu-Leung,
910 F.2d 33, 41 (2d Cir. 1990) (knowledge of right to refuse
consent not required).

        Consent "can be found from an individual's words, acts
or conduct." United States v. Deutsch, 987 F.2d at 883 (internal
quotation marks and citations omitted).  To determine whether
consent was voluntary or, on the other hand, "was the product of
duress or coercion, express or implied," Bustamonte, 412 U.S.
at 227, courts examine the totality of the circumstances
surrounding the consent. Id. at 227; Garcia, 56 F.3d at 422;
United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986).  The
factors used to determine whether express consent is voluntary or
instead coerced include: the individual's knowledge of his right
to refuse consent; the individual's age, intelligence and
education; the length and the nature of questioning; the presence

-14-

of coercive police behavior; the use of physical punishments or deprivations; and whether the alleged consenting person was advised of his constitutional rights. Bustamonte, 412 U.S. at 226-27; see also United States v. Yu-Leung, 910 F.2d at 41; Puglisi, 790 F.2d at 243 (noting that "in cases where consent is obtained from a person in custody, [the reviewing court may consider] whether guns were drawn or the consenting individual was frisked or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search") (citations omitted); see, e.g., United States v. Ceballos, 812 F.2d 42, 51 (2d Cir. 1987) (consent to search was voluntary where defendant was forcibly arrested, given Miranda warnings, questioned for a few hours, threatened with search warrant, and offered low bail and help in retaining job before giving consent).

        The relevant factual inquiry is guided by an "objective standard," and the ultimate question is whether "the officer had a reasonable basis for believing that there had been consent to the search." Garcia, 56 F.3d at 423.  A defendant claiming that consent was not voluntary must make a substantial showing of coercive conditions. As the Second Circuit has observed:

> [T]he presence of three law enforcement officers
> [does not] lend significant support to a claim of
> coercion.  Consent to a search has been found
> despite formal arrest, and such additional
> aggravating circumstances as handcuffing of a
> suspect, the presence of six law enforcement

-15-

> officers in his home, and their assurance that they
> would remain indefinitely and secure a search
> warrant if consent were withheld.

Id. (internal citations omitted); see also Florida v. Jimeno, 500
U.S. 248, 251 (1991) ("The standard for measuring the scope of a
suspect's consent under the Fourth Amendment is that of
'objective' reasonableness — what would the typical reasonable
person have understood by the exchange between the officer and
the suspect?").

In the alternative, abandonment or disclaimer of
property can justify a search of that property without a warrant
or probable cause.  Mere ownership of property does not establish
a legitimate expectation of privacy unless the owner vigilantly
protects the right to exclude others.  United States v. Torres,
949 F.2d 606, 608 (2d Cir. 1991).  Therefore, even in the absence
of a warrant, a search of property that has been abandoned or
disclaimed does not violate a privacy interest.  See id.

## C.  Discussion

Here, the defendant provided clear consent for the
agents to search the Federal Express package and its contents.
First, the defendant voluntarily opened the Federal Express
package when asked to do so.  When asked by the Special Agents
what he would do with the contents of the Federal Express
package, the taped up magazine, the defendant said that he would
throw the package out.  After the defendant made this statement,

-16-

when the Special Agents asked if they could take the package, the defendant stated that the Special Agents could take the package. By allowing the Special Agents to take the Federal Express package that he indicated that he was going to "throw out," the defendant consented to its search.

In his motion, the defendant first draws an inconsequential distinction between the Federal Express package (the "first package") that the defendant opened in the presence of the Special Agents and that package's contents, the taped up Reader's Digest magazine (which the defendant refers to as the "second package"). The defendant himself opened the Federal Express package and consented to the search of the taped up magazine by allowing the Special Agents to take the magazine with them, after he indicated that he was going to discard it anyway. As a result, the defendant did not need a warrant to open the taped up magazine and the discovery of its contents, $4,000 in cash, is admissible as the fruit of a valid search.

The defendant also asserts that his consent was coerced by the Special Agents' "strategy of intimidation and the silent coercion that is participated upon their target with the element of surprise." The defendant argues that he "did not feel that he was free to reject their request or that he was free to leave" and that "a request from an FBI Agent is more like a direction with which [he] felt he had to comply."

-17-

The circumstances surrounding the defendant's consent counter such arguments, instead showing that his consent was voluntary and obtained without coercive behavior on the part of the FBI Special Agents.  To determine whether consent was voluntarily given, courts examine the totality of the circumstances surrounding the consent.  United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004).  Factors considered include the individual's knowledge of his right to refuse consent, his age, intelligence, and education, length and nature of his questioning, or the presence of coercive law enforcement behavior.  Id. at 226-27.  Here, the defendant was approached by FBI agents at his business and was not taken to a private room or another location.  The defendant was neither handcuffed nor arrested.  The FBI Special Agents did not draw their weapons or threaten arrest.  In fact, the FBI Special Agents merely asked the defendant questions which the defendant freely answered.  The questioning itself took place over a brief period of time, lasting approximately fifteen minutes.

When the defendant was asked to open the Federal Express package, he voluntarily opened the package, discovering the taped up Reader's Digest magazine.  Importantly, when asked to open the magazine, the defendant refused to open it.  The defendant's refusal shows that he was not merely acquiescing to the authority of the Special Agents.  The fact that the defendant

-18-

felt free to refuse such a request counsels in favor of the
voluntariness of the defendant's answers to questions and his
actions.  If the defendant was as intimidated and as pressured as
he implies in his argument in support of his motions, he would
not have felt free to refuse the request by the FBI Special
Agents to open up the taped up magazine.  After this refusal and
his statement that he intended to throw out the taped up
magazine, the defendant told the Special Agents that they could
take the magazine with them, both implying his consent to search
and abandoning the magazine into the custody of the Special
Agents.

          The defendant argues that the Special Agents should
have gotten a search warrant to search the supposed "second
package," the taped up magazine, after the defendant had given it
to Special Agents.  However, it is well settled that a search
based upon the consent of an individual may be undertaken without
a warrant and any evidence discovered during that search may be
seized and admitted at trial.  Bustamonte, 412 U.S. at 219.  Even
if the defendant is correct in considering the Federal Express
package and the enclosed taped up magazine as separate
"packages," consent extends to interior containers if a
reasonable person would construe the scope of consent to cover
those containers. See Florida v. Jimeno, 500 U.S. 248, 250-51
(1991); United States v. Mire, 512 F.3d 349, 352 (2d Cir. 1995);

-19-

United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995).  As a result, the defendant's motion to suppress the Federal Express package and its contents must be denied.

**CONCLUSION**

For the foregoing reasons, the defendant's pre-trial motions should be denied in their entirety without a hearing.

Dated:    New York, New York
          May 29, 2006

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____
    Steve C. Lee
    Assistant United States Attorney
    Tel. (212) 637-2413

-20-

## DECLARATION OF SERVICE

I, STEVE C. LEE, declare pursuant to 28 U.S.C. § 1746 that on May 29, 2008, I caused one copy of the Government's Memorandum of Law in Opposition to the Defendant's Pre-Trial Motions to be delivered to:

> Albert Y. Dayan, Esq.
> 80-02 Kew Gardens Road
> 9th Floor
> Kew Gardens, New York 11415

I declare under penalty of perjury that the foregoing is true and correct.

May 29, 2008

_____
STEVE C. LEE

# GOVERNMENT EXHIBIT A

On June 26, 2007, a surveillance was conducted in the vicinity of NELLIES FINE JEWELRY, 108-09 Queens, Blvd., Forest Hills, N.Y., telephone (718) 793-6908.

At approximately 10:10 a.m., a FedEx delivery truck parked in the vicinity of NELLIES. SA Nygaard walked into NELLIES, and found a person later identified as JAKOB NATANOV, date of birth 01/19/1958, working behind the jewelry counter. Immediately after SA Nygaard entered the premises, FedEx Courier George Rivera and a FedEx trainee entered the premises. When the Fed Ex couriers entered, NATANOV walked over to them and he was handed a package bearing FedEx number 8592 0570 0478. The FedEx courier asked what name he should write down for his records, and NATANOV, in substance, said "JACOB, COYNE, whatever". SA Karounos, and SA Linder entered as the FedEx couriers exited. NATANOV was then interviewed about the package that had been delivered.

NATANOV said he does not know what is in the FedEx package, but it could be a magazine. NATANOV often gets calls from people who say they want to send him magazines. Among the types of magazine are trade magazines. The magazines come via Fed Ex. He opens the packages and then throws away the magazines.

NATANOV was asked why he told the Fed Ex courier that he could write down JACOB or COYNE as the person who accepted delivery. NATANOV said the he sometimes goes by the name COIN. When NATANOV was asked why the name COYNE did not appear on his passport or his driver's license, NATANOV continued to say that COYNE is a name he uses.

The interviewing agents asked NATANOV to open the Fed Ex package. NATANOV opened the package and found a Reader's Digest Magazine wrapped in snowman wrapping paper. The Reader's Digest magazine was taped up on three sides with masking tape. NATANOV refused to untape the magazine to see what, if anything, was inside the magazine. NATANOV was asked what he would do with this magazine. NATANOV said that he would throw it out.

The interviewing agents then asked if they could take the magazine with them. NATANOV said that they could. The package contained $4,000 in cash.

Investigation on __06/26/07__ at Queens, N.Y.

File # 196D-NY-290468 INV 8F    Date dictated __06/26/07__
by   SA Elizabeth Nygaard    SA Michael Linder
     SA Christopher McKeough    SA John G Karounos    8

FD-302a (Rev. 10-6-95)

196D-NY-290468 INV 8F

Continuation of FD-302 of ___Jakob Natanov_____ , On _06/26/07_ , Page ___2___

      While the interviewing agents were talking to NATANOV, the telephone rang.  The caller ID said the call was from telephone (718) 669-0364.

      After exiting the premises, SA Linder and SA Nygaard waited outside for another FedEx delivery.  At about 11:00 a.m. FedEx courier JUAN BENCOSME delivered package bearing Fed Ex tracking number 8620 7268 0014.  NELLIES was closed, and there was a sign on the door saying that they would reopen at 12:00. BENSCOSME gave the FedEx package to SA Nygaard.  The package contained $5,000 in cash.

      NATANOV was in possession of his wife's U.S. Passports. The following information was obtained from the passport:

      Name:      NILI NATANOB
      Date of birth: 09/06/1956
      US Passport No.425 911 351

The following information was obtained from JAKOB NATANOV's passport

      Name:      JAKOB NATANOV
      Date of birth: 01/19/1958
      U.S. Passport No.425 911 350

JAKOB NATANOV was also in possession of the following passport

      Name:      YAKOV NATANOV
      Date of birth:   01/19/1958
      Israeli Passport No.8861135

9